GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS JR., SBN 132099
    TBoutrous@gibsondunn.com
THEANE EVANGELIS, SBN 243570
    TEvangelis@gibsondunn.com
CYNTHIA CHEN MCTERNAN, SBN 309515
    CMcTernan@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

GIBSON, DUNN & CRUTCHER LLP
MEGAN COONEY, SBN 295174
    MCooney@gibsondunn.com
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone:    949.451.3800
Facsimile:    949.451.4220

*Attorneys for Defendant Apple Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANCIS COSTA, AMANDA HOFFMAN, and OLIVIA MCILRAVY-ACKERT, individually and on behalf of others similarly situated, | CASE NO. 3:23-cv-01353-WHO |
| Plaintiffs, | **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR DECERTIFICATION OF THE FLSA COLLECTIVE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| APPLE INC., | Date:    December 18, 2024 |
| Defendant. | Time:    2:00 p.m.<br>Place:   In-Person Hearing Requested<br>Judge:   William H. Orrick |

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE THAT** on Wednesday, December 18, 2024, at 2:00 p.m., or as

3  soon thereafter as the matter may be heard before the Honorable William H. Orrick of the above-

4  entitled court, located at the Phillip Burton Federal Building & United States Courthouse, 450 Golden

5  Gate Avenue, Courtroom 2, San Francisco, California 94102, Defendant Apple Inc. ("Apple") will and

6  hereby does move this Court for an order decertifying Plaintiffs' collective under the Fair Labor

7  Standards Act ("FLSA").

8      This motion is brought on the grounds that the opt-in plaintiffs are not "similarly situated"

9  because they do not "share a similar issue of law or fact material to the disposition of their FLSA

10  claims." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1117 (9th Cir. 2018).  Instead, the Court will

11  need to conduct hundreds, if not thousands, of mini-trials on dispositive questions, including whether

12  the opt-in plaintiffs are even entitled to overtime pay (or instead are exempt employees not entitled to

13  any overtime compensation), and what individual opt-ins understood to be the purpose of the RSU

14  awards they received, which is critical to establishing liability under Plaintiffs' theory.  Moreover,

15  thousands of opt-in plaintiffs are subject to binding arbitration agreements covering their claims.

16      Apple's motion is based on this Notice of Motion and Motion, the accompanying Memorandum

17  of Points and Authorities, the concurrently filed Declaration of Cynthia Chen McTernan and attached

18  exhibits, the concurrently filed Declaration of Courtney Robles and attached exhibits, the concurrently

19  filed Declaration of Joe Thomas, Jr., all additional declarations and exhibits concurrently filed with

20  this Motion, any other matters of which the Court may take judicial notice, other documents on file in

21  this action, and any oral argument of counsel.

DATED: October 14, 2024

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS JR.
THEANE EVANGELIS
MEGAN COONEY
CYNTHIA CHEN MCTERNAN

By: /s/ Theane Evangelis
    Theane Evangelis

*Attorneys for Defendant Apple Inc.*

iii

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

1

**TABLE OF CONTENTS**

2
**Page**

3     I.     INTRODUCTION ............................................................................................... 1

4     II.    BACKGROUND ................................................................................................ 2

5           A.     Apple's Discretionary RSU Program ..................................................... 2

6           B.     Individualized Manager Discussions Regarding RSUs ......................... 5

7           C.     Apple's Arbitration Agreement .............................................................. 8

8           D.     Procedural Posture ................................................................................. 9

9     III.   LEGAL STANDARD ...................................................................................... 11

10    IV.    ARGUMENT ................................................................................................... 12

11           A.     Plaintiffs Are Not Similarly Situated Because the Resolution of Their Claims
                    Turns on Individualized Issues ............................................................ 12
12
             B.     Exempt Plaintiffs Cannot Be Similarly Situated as to Any Material Issue ................ 16
13
             C.     Plaintiffs Are Not Similarly Situated Because Nearly Half the Opt-In Plaintiffs
14                  Must Arbitrate Their Claims ................................................................ 21

15    V.     CONCLUSION ................................................................................................ 24

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

## TABLE OF AUTHORITIES

**Page**

### Cases

*Bitstamp Ltd. v. Ripple Labs Inc.*,
    2015 WL 4692418 (N.D. Cal. Aug. 6, 2015)................................................................22

*Campbell v. City of Los Angeles*,
    903 F.3d 1090 (9th Cir. 2018).....................................................1, 11, 12, 14, 16, 22

*Carlino v. CHS Medical Staffing, Inc.*,
    634 F. Supp. 3d 895 (E.D. Cal. 2022).....................................................................22

*Culley v. Lincare Inc.*,
    2017 WL 3284800 (E.D. Cal. Aug. 2, 2017) ...........................................................14

*Errickson v. Paychex, Inc.*,
    447 F. Supp. 3d 14 (W.D.N.Y. 2020) .....................................................................23

*Geiger v. Charter Comms., Inc.*,
    2019 WL 8105374 (C.D. Cal. Sept. 9, 2019)......................................................22, 23

*Genesis Healthcare Corp. v. Symczyk*,
    569 U.S. 66 (2013) ...............................................................................................11

*Gonzales v. Charter Commc'ns, LLC*,
    2020 WL 8028108 (C.D. Cal. Dec. 4, 2020) ...........................................................23

*Guanzon v. Vixxo Corp.*,
    2019 WL 1586873 (D. Ariz. Apr. 12, 2019).....................................................16, 17, 18

*Ortiz v. Amazon.com LLC*,
    2022 WL 1598968 (N. D. Cal. May 20, 2022) .........................................................20

*Perez v. Wells Fargo & Co.*,
    2015 WL 10558841 (N.D. Cal. Nov. 24, 2015).....................................................17, 20

*Phillips v. County of Riverside*,
    2022 WL 2162822 (C.D. Cal. Apr. 7, 2022) ...........................................................16

*Salazar v. Driver Provider Phoenix LLC*,
    2023 WL 5608388 (D. Ariz. Aug. 30, 2023).......................................................17, 20

*Smith v. Spizzirri*,
    601 U.S. 472 (2024) ..............................................................................................23

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009)..................................................................................20

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
    571 F.3d 953 (9th Cir. 2009)..................................................................................20

Gibson, Dunn &
Crutcher LLP

v

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

## TABLE OF AUTHORITIES

(continued)

**Page**

### Statutes

29 U.S.C. § 207(e)(1) .................................................................................................13

29 U.S.C. § 207(e)(2) .................................................................................................13

29 U.S.C. § 216(b) .....................................................................................................11

### Regulations

29 C.F.R. § 541.2 .......................................................................................................20

29 C.F.R. § 541.400 ...............................................................................................18, 19

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs' motion for conditional certification under the Fair Labor Standards Act relied on the premise that all opt-in plaintiffs were "similarly situated" based on an over-simplified account of the case.  Now that months of discovery into the named Plaintiffs and thousands of opt-in plaintiffs have taken place—including 15 depositions, production of hundreds of thousands of pages of records by Apple, and written discovery responses from over 200 plaintiffs—it is apparent that Plaintiffs' narrative is not reality.  At the second stage of collective certification, Plaintiffs cannot rely on the same threadbare allegations and limited evidence they submitted before.  Instead, they must grapple with the now significant evidence that adjudicating each of the opt-in plaintiffs' claims will depend on individualized circumstances.  Plaintiffs cannot carry the heavy burden to show with substantial evidence that all these claims can be adjudicated together.  *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1118–20 (9th Cir. 2018).  The Court should decertify the FLSA collective.[1]

The underlying merits of Plaintiffs' claims depend on whether the value of the shares underlying vested restricted stock units ("RSUs") were *wrongfully* excluded from the regular rate of pay when calculating overtime wages.  It is undisputed that Apple excluded this value from its calculation of overtime wages, but the fact of having done so is not evidence in itself of any violation of the FLSA.  Instead, Plaintiffs must show that the value of vested RSUs must be included in the regular rate of pay.  In their attempt to establish that critical fact, Plaintiffs are relying, not on anything common to the collective, but individualized evidence regarding each individual employee's perception of their RSUs, including based on the way RSUs were described to them by their individual managers.  Plaintiffs are therefore not similarly situated with respect to this threshold material issue necessary to resolve their claims.

Furthermore, the Court will need to conduct individualized "mini-trials" for dozens of opt-in plaintiffs not subject to arbitration to determine whether they are properly classified as non-exempt and

---

[1] Many of the same reasons for decertifying the collective also warrant denying Plaintiffs' motion for class certification, as outlined in Apple's opposition, which Apple incorporates here by reference and which has been filed concurrently.

therefore entitled to overtime pay at all.  Apple has identified at least 14 positions held by members of the collective that, although at times classified as non-exempt, may in fact be exempt positions depending on the employee's job responsibilities.  Where, as here, these individual inquiries go to the heart of the merits issue, plaintiffs cannot be similarly situated.

Finally, thousands of opt-in plaintiffs who are bound by valid and enforceable arbitration agreements are not similarly situated to the plaintiffs who are not bound by such agreements.  Even if the FLSA collective is not decertified, the collective definition should be modified to exclude the thousands of opt-in plaintiffs who agreed to arbitrate their claims.  The Court has already found that Apple's arbitration agreement is enforceable and compelled four opt-in plaintiffs to individual arbitration.  Dkt. 130.  The same result should hold for the 3,683 opt-in plaintiffs who filed consent forms but signed, and are subject to, valid and enforceable arbitration agreements.  Because these opt-in plaintiffs cannot bring their claims in this Court, they are not similarly situated to the plaintiffs and the collective definition should be revised to carve them out.

## II.     BACKGROUND

### A.     Apple's Discretionary RSU Program

Apple is one of the world's leading developers of digital communications and media devices. Dkt. 92 ¶ 15.  To manufacture, market, and sell the well-loved iPhone, iPad, MacBook, and iMac devices, Apple employs thousands across the United States—from Apple's corporate headquarters in Cupertino, California, to its traditional retail stores nationwide—in many different roles.  *See* Declaration of Joe Thomas Jr. (Thomas Decl.) ¶ 3.

Apple works hard to create a culture where everyone is empowered to do their best work, and believes that all employees should have the unique opportunity to share in the company's success.  *See* Declaration of Cynthia Chen McTernan (McTernan Decl.), Ex. 1 (RSU Grant Email) at APLCOSTA00442368.  Apple believes in investing in its people and, in addition to highly competitive base pay, industry-leading benefits, training and development opportunities and discounts on Apple products and services, Apple was among the first companies in the U.S. to make all employees eligible to become shareholders through its discretionary stock programs.  *See* McTernan Decl., Ex. 2 (2022

Employee Stock Plan) at APLCOSTA00000069; *id.*, Ex. 3 (2014 Employee Stock Plan) at APLCOSTA00000047; *id.*, Ex. 4 (Jenkinson 30(b)(6) Dep. Tr.) at 70:10–23. Apple has made the discretionary decision to grant RSU awards to certain groups of non-exempt employees because Apple believes that, similar to stock options, RSUs give employees "the opportunity to share in [the] long-term success [of the Company] by acquiring a proprietary interest in the Company," will "promote the long-term success of the Company," and "creat[e] shareholder value." McTernan Decl., Ex. 2 (2022 Employee Stock Plan) at APLCOSTA00000061; *id.*, Ex. 3 (2014 Employee Stock Plan) at APLCOSTA00000040.

An RSU is a type of equity award which grants an employee an unsecured future right to one share of Apple stock on a specific date (called a "vesting date") provided the conditions of the agreement are met. *See* McTernan Decl., Ex. 2 (2022 Employee Stock Plan) at APLCOSTA00000065, APLCOSTA00000076; *id.*, Ex. 3 (2014 Employee Stock Plan) at APLCOSTA00000043, APLCOSTA00000053–54. Importantly, RSU awards are not a grant of unrestricted or restricted shares, and RSUs do not have an actual realizable value unless and until they vest. *See id.*, Ex. 5 (2022 Employee Stock Plan Prospectus) at APLCOSTA00001635–36, APLCOSTA00001641; *id.*, Ex. 6 (2014 Employee Stock Plan Prospectus) at APLCOSTA00001649–50, APLCOSTA00001654. At the time Apple grants an RSU award, the future value of the underlying share is unknown, indeterminable, and cannot be predicted with certainty. The value at vesting—when the share is transferred to the employee—will depend entirely on the market price of Apple's stock on each particular vesting date and the value of the shares will continue to be variable based on the market price once issued. *See id.*, Ex. 5 (2022 Employee Stock Plan Prospectus) at APLCOSTA00001635–36, APLCOSTA00001641; *id.*, Ex. 6 (2014 Employee Stock Plan Prospectus) at APLCOSTA00001649–50, APLCOSTA00001654.

Apple's RSU awards, which are governed by the applicable Apple Employee Stock Plan and RSU Award Agreement, McTernan Decl., Ex. 7 (Thomas 30(b)(6) Dep. Tr.) at 35:12–17, are discretionary and not guaranteed each year. Apple has "no obligation . . . to continue the Plan and/or grant any additional awards." *Id.*, Ex. 2 (2022 Employee Stock Plan) at APLCOSTA00000078; *id.*,

Ex. 3 (2014 Employee Stock Plan) at APLCOSTA0000056.  And any RSU award "is an exceptional, discretionary, one-time grant, is voluntary, and occasional and does not create any contractual or other right to receive future awards of RSUs, or benefits in lieu of RSUs, even if RSUs have been awarded in the past."  *Id.*, Ex. 8 (2022 Employee Stock Plan Global Restricted Stock Unit Award Agreement) at APLCOSTA00001625.  Moreover, "all decisions with respect to future awards, if any, will be at the sole discretion of the Company," and the "RSUs and the Shares subject to the Award, and any related income and value, are extraordinary items that do not constitute compensation of any kind for services of any kind rendered to the Company."  *Id.*

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  McTernan Decl., Ex. 7 (Thomas 30(b)(6) Dep. Tr.) at 24:16–25.  Although all non-exempt employees are eligible to participate in the RSU program, McTernan Decl., Ex. 2 (2022 Employee Stock Plan) at APLCOSTA00000069; *id.*, Ex. 3 (2014 Employee Stock Plan) at APLCOSTA00000047, and the recommendation to grant an RSU award is not tied in any way to an employee's hours worked, production, or attendance, there are situations in which an employee may not be recommended to receive a grant.  McTernan Decl., Ex. 4 (Jenkinson 30(b)(6) Dep. Tr.) at 52:16–24; 137:19–138:8.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  McTernan Decl., Ex. 7 (Thomas 30(b)(6) Dep. Tr.)  at 20:21–25; 21:9–22:7.

Employees who are selected to receive an award are notified of their RSU award via email, including details regarding the grant date, number of RSUs, and vesting commencement date.  McTernan Decl., Ex. 4 (Jenkinson 30(b)(6) Dep. Tr.) at 99:15–19.  Participation in the RSU program is voluntary, and employees have the option to decline their RSU award.  *Id.*, Ex. 1 (RSU Grant Email) at APLCOSTA00442368.  Some employees decline their RSU award for reasons including tax and religious considerations.  *Id.*, Ex. 4 (Jenkinson 30(b)(6) Dep. Tr.) at 80:13–81:11.

████████████████████████████████████████████

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  McTernan Decl., Ex. 4 (Jenkinson 30(b)(6) Dep. Tr.) at

2    70:19–23.  RSUs continue to vest even if an employee is not working, although the vesting schedule

3    may extend if an employee is on an "unpaid personal leave of absence" that is longer than 30 days.  *Id.*

4    at 134:22–135:3, 137:2–7.  For example, named Plaintiff McIlravy-Ackert's RSUs continued to vest

5    while she was on medical leave for six months.  McTernan Decl., Ex. 9 (McIlravy-Ackert Dep. Tr.) at

6    49:8–13, 119:1–4.

7         Once an RSU vests, the underlying Apple share is issued, meaning it is transferred to the

8    employee's personal brokerage account and the employee is free to do whatever they want with it,

9    which varies widely.  McTernan Decl., Ex. 4 (Jenkinson 30(b)(6) Dep. Tr.) at 148:6–25.  Both the

10   named Plaintiffs and opt-in plaintiffs testified that sales of their vested shares allowed them to make

11   meaningful purchases for themselves and their families.  For example, McIlravy-Ackert sold her vested

12   shares for a down payment for a house and further renovations, *id.*, Ex. 9 (McIlravy-Ackert Dep. Tr.)

13   at 92:25–93:9, 97:8–14, as did opt-in plaintiff Christopher Hernandez, *id.*, Ex. 10 (Hernandez Dep. Tr.)

14   at 46:3–11.  Opt-in plaintiff Matthew Waldman sold his vested shares to pay for his son's education

15   and invest in his photography business.  *Id.*, Ex. 11 (Waldman Dep. Tr.) at 56:8–19.  Safiya Sears sold

16   her vested RSUs whenever she wanted to buy something "extravagant," *id.*, Ex. 12 (Sears Dep. Tr.) at

17   33:16–24, and Vaneh Shahinyan testified that she was able to stay home with her child in part because

18   of money she made from selling vested shares.  *Id.*, Ex. 13 (Shahinyan Dep. Tr.) at 48:10–20.  James

19   Doyle sold vested shares "to pay off debt" and "to put towards a down payment for a house."  *Id.*, Ex.

20   14 (Doyle Dep. Tr.) at 56:5–9.  Lily Free routinely sells her shares "immediately, as soon as they're

21   available to sell," with the aim of reinvesting them in other securities.  *Id.*, Ex. 15 (Free Dep. Tr.) at

22   66:19–69:8.  Meanwhile, Eric Roch has never sold any of his vested RSUs because he believes owning

23   Apple stock is a good long-term investment.  *Id.*, Ex. 16 (Roch Dep. Tr.) at 37:18–24.  Similarly, Rachel

24   Case has never sold any vested shares because "they're growing in dollar amount" and because she did

25   "not need" to sell them.  *Id.*, Ex. 17 (Case Dep. Tr.) at 64:17–22.

26        **B.    Individualized Manager Discussions Regarding RSUs**

27        Although Apple employees who were granted RSU awards were notified via email, many of

28

5

them learned of their eligibility or grant from discussions with their managers. According to the testimony of the named Plaintiffs, opt-in plaintiffs, and managers, the information conveyed by managers regarding RSUs varied widely. *See, e.g.*, McTernan Decl., Ex. 18 (Hoffman Dep. Tr.) at 38:23–39:8 (RSUs described as part of bonus and part of pay); *id.*, Ex. 19 (Costa Dep. Tr.) at 90:6–9 (RSUs described as part of merits increase); *id.*, Ex. 20 (Nisenboym Dep. Tr.) at 33:7–14 (no memory of manager ever discussing RSUs). For example, named Plaintiff McIlravy-Ackert testified that in performance reviews with her supervisors, they would "highlight all the different benefits that the company offers, the health insurance and that kind of stuff, and then go[] over your compensation which they would always say included the stock grant for the RSUs." *Id.*, Ex. 9 (McIlravy-Ackert Dep. Tr.) at 49:24–50:19. Named Plaintiff Hoffman testified that she recalled her "supervisor specifically telling" her that her "RSUs are part of [her] annual bonus" and "part of [her] pay [given] here at Apple." *Id.*, Ex. 18 (Hoffman Dep. Tr.) at 38:23–39:8. Named Plaintiff Costa testified that his managers told him that "as part of [his] merit increase, [he was] receiving RSU grants." *Id.*, Ex. 19 (Costa Dep. Tr.) at 90:6–9.

By contrast, Safiya Sears testified that in annual meetings with her manager, "the conversation would basically be like this is what [your raise] is, this is your RSUs, and to compensate for whatever else, . . . these are the other benefits you're also receiving." McTernan Decl., Ex. 12 (Sears Dep. Tr.) at 20:15–24. James Doyle testified that RSUs were only discussed in store-wide meetings when "new employees were being given information about their benefits." *Id.*, Ex. 14 (Doyle Dep. Tr.) at 32:11–23. Rachel Case testified that manager discussions about compensation and RSU awards were "typically, 'Here's the percentage of your raise. Here is your new dollar amount. Here is the RSU grant.'" *Id.*, Ex. 17 (Case Dep. Tr.) at 43:21–23. Eric Roch testified that "[t]he conversations around RSUs tended to be pretty generic and vague" and that Apple RSU awards were discussed "in the context of setting expectations for promotions." *Id.*, Ex. 16 (Roch Dep. Tr.) at 34:13–14; 31:24–25. Some opt-in plaintiffs had no recollection of their managers ever discussing RSUs with them. *See id.*, Ex. 20 (Nisenboym Dep. Tr.) at 33:7–14 (testifying that he could not recall any conversations where his manager discussed RSUs, but viewed RSUs as "another benefit that employees at Apple got"); *id.*, Ex.

1   13 (Shahinyan Dep. Tr.) at 62:21–63:6 (no recollection of discussing RSUs with manager).

2          Additionally, Apple managers themselves described a variety of approaches in discussing RSUs

3   with the hourly employees they supervised.  Erik Schaeffer, who manages hourly employees in the

4   Data Scientist 2 role, described "separately discuss[ing] Restricted Stock Units, with other programs

5   offered by Apple such as benefits like health insurance and 401(k)."  Declaration of John Erik Schaeffer

6   (Schaeffer Decl.) ¶ 7.  Babak Shafiei, a Software Development Engineer Manager who has supervised

7   hourly employees in a variety of roles, did not communicate with the hourly employees he supervised

8   concerning their discretionary awards of RSUs "unless it was in the context of a promotion."

9   Declaration of Babak Shafiei (Shafiei Decl.) ¶ 10.   Hardware Development Manager Erica Sheu

10  discussed RSU awards with employees she supervised during their performance review and would

11  identify "any Restricted Stock Unit ('RSU') grant Apple may have recommended for them that year,

12  in addition to the bonus they may have earned and any changes to their rate of pay."  Erica Sheu

13  Declaration (Sheu Decl.) ¶ 5.  Anna Knull, who supervised named Plaintiff Costa, discussed RSUs

14  with hourly team members "during annual reviews" by walking them through "the annual review form

15  that they [received]."  Anna Knull Declaration (Knull Decl.) ¶¶ 2, 4–6.  She explained that "[a]fter

16  discussing an employee's RSU award for that year . . . the conversation would flow naturally to the

17  other great programs Apple provide[d] to its employees, including their opportunity to purchase stock

18  at a discount pursuant to Apple's Employee Stock Purchase Plan, . . . insurance benefits and 401(k)

19  matching contributions."  *Id.*  Justin Etzine, who supervised hourly employees in the Software

20  Development Engineer – Systems 2 role, "explained that any salary increase or bonus was provided in

21  recognition of the employee's great work, whereas the RSU grant was a discretionary award from

22  Apple intended to provide employees an opportunity to share in the future success of the company."

23  Justin Etzine Declaration (Etzine Decl.) ¶ 5.  And Senior Engineering Manager Krishna Kumar Gattam

24  Pandurangan described to hourly employees that RSU awards are "discretionary and may be based on

25  various factors, including company performance and the state of the financial market."  Krishna Kumar

26  Gattam Pandurangan Declaration (Gattam Pandurangan Decl.) ¶ 6.

27

28

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

1

### C.    Apple's Arbitration Agreement

2        Since June 2016, Apple has asked all applicants who receive a conditional offer of employment

3    to sign an arbitration agreement.  Declaration of Courtney Robles (Robles Decl.) ¶ 3; *see also* Dkt. 130

4    at 1.  Until summer 2017, Apple primarily sent onboarding documents to applicants by mail via FedEx

5    to the address in the individual's job application file, accompanied by a FedEx return envelope.  Robles

6    Decl. ¶¶ 3–4.    After an applicant completed his or her review, acknowledged, and signed the

7    onboarding documents, he or she mailed the onboarding documents back to Apple using the FedEx

8    return envelope provided.  *Id.* ¶ 3. Once Apple received these documents, it would scan them and

9    upload them to Apple's human resources information system ("HRIS").  *Id.*

10        Beginning in September 2017, Apple started sending onboarding documents, including an

11    arbitration agreement, to applicants who received a conditional offer of employment electronically.

12    Robles Decl. ¶ 5.    Applicants first make accounts on Apple's recruiting system by creating the

13    username and password of their choice.  *Id.* ¶ 4.    Through this system, applicants can submit

14    applications for jobs with the company and Apple can track the progress of an applicant through the

15    recruiting process.  *Id.*  Once Apple is ready to make an offer of employment, it provides the applicant

16    (via the recruiting system) a link to Apple's online onboarding platform.  *Id.* ¶ 5. As with the recruiting

17    system, the applicant must use their email address that they used to apply to Apple (which is their

18    username) to create a unique password to access the onboarding platform.  *Id.*  The onboarding platform

19    records the applicant's electronic signatures with the date, time, and signatory's IP address stamped

20    besides the applicant's name, a measure taken to ensure signature is genuine.  *Id.*  Once the applicant

21    completes the paperwork, it is transmitted to Apple through the onboarding platform, where the

22    paperwork is then electronically stored in the applicant's personnel file within HRIS.  *Id.*

23        Although Apple has used eight different versions of the arbitration agreement since 2016, all

24    versions of the agreement are substantively similar to one another and to the May 2016 and January

25    2019 versions of the agreement that this Court found valid and enforced in its January 19, 2024 Order

26    on Apple's motion to compel four opt-in plaintiffs to arbitration.  *See* Dkt. 130; Robles Decl. ¶¶ 9–10;

27    *id.* Ex. B (May 2016 Arbitration Agreement); *id.* Ex. G (January 2019 Arbitration Agreement).  The

28

substantive scope of the arbitration agreements is identical, covering "all disputes arising out of or related to [an employee's] employment with Apple Inc.," including "disputes related to . . . wages [and] overtime," as well as "claims arising under the . . . Fair Labor Standards Act." *E.g.*, Robles Decl., Ex. C (July 2017 Arbitration Agreement) ¶¶ 1, 2; *id.*, Ex. F (November 2018 Arbitration Agreement) ¶¶ 1, 2. All of the arbitration agreements also "include a class action waiver, [and] a delegation clause." Dkt. 130 at 2; *see also, e.g.*, Robles Decl., Ex. D (August 2017 Arbitration Agreement) ¶¶ 4, 7. The delegation clause provides that the applicant and Apple "agree that any legal dispute or controversy covered by this Agreement, or arising out of, relating to, or concerning the scope, validity, enforceability, or breach of this Agreement (except for challenges to the validity or enforceability of the Class Action Waiver as described in paragraph 4, above), shall be resolved by final and binding arbitration in accordance with the JAMS Rules then in effect, and not by a court or jury trial." *E.g.*, Robles Decl., Ex. H (February 2022 Arbitration Agreement) ¶ 7.[2] Starting in May 2018, the arbitration agreement provided applicants an explicit right to opt out. Robles Decl. ¶ 6; *see also, e.g.*, *id.*, Ex. E (May 2018 Arbitration Agreement) ¶ 10.

### D. Procedural Posture

In their Third Amended Complaint, Plaintiffs allege that Apple did not include the value of vested restricted stock units in the regular rate of pay, which resulted in a failure to properly pay overtime pay in violation of the FLSA, and California and New York state law. Dkt. 86 ¶¶ 79–98, 117–127.

On September 28, 2023, Plaintiffs moved for conditional certification and distribution of judicial notice under the FLSA. Dkt. 78. Apple opposed the motion, including because the proposed collective definition encompassed individuals who had signed binding arbitration agreements and thus are precluded from bringing their claims in this forum. Dkt. 84 at 13–17. Concurrently, Apple filed a motion to compel arbitration as to the four plaintiffs who had already opted in to this action but were subject to binding arbitration agreements. Dkt. 83.

---

[2] The October 2022 version of Apple's arbitration agreement also excludes from the delegation clause disputes "required by law" to be decided by a court. Robles Decl., Ex. I (October 2022 Arbitration Agreement) ¶ 7.

9

On November 21, 2023, the Court granted Plaintiffs' motion to distribute notice to a conditionally certified FLSA collective, finding that Plaintiffs had met the "lenient standard" for showing that putative collective members are "similarly situated" by "produc[ing] declarations from numerous Apple employees, all of which allege that they were victims of a single decision, policy, or plan." Dkt. 98 at 4–5 (quotation marks omitted).  With respect to putative collective members "who may be subject to valid arbitration agreements," the Court found that "the mere possibility of mandatory arbitration should not prevent the conditional certification of a collective action." *Id.* at 7–8.  Because the Court had not yet ruled on the enforceability of Apple's arbitration agreement and the exact number of employees who opted out was not in the record, the Court held that notice would not be delayed pending a decision on Apple's motion to compel arbitration. *Id.* at 9–10.

On December 8, 2023, the Court modified the definition of the collective to "[a]ll current and former employees of Apple[] Inc. classified as non-exempt/overtime eligible who received restricted stock units that vested on or after March 23, 2020, and who recorded more than forty hours of work in a workweek after receiving an RSU but before the RSU vested." Dkt. 112 at 4.  Notice was issued on January 3, 2024 to more than 47,000 current and former Apple employees.

On January 19, 2024, the Court granted Apple's motion to compel arbitration, finding that the delegation clause in Apple's 2016 and 2019 arbitration agreements delegating arbitrability questions to the arbitrator was valid and enforceable.  Dkt. 130 at 12. As a result, the Court compelled the four opt-in Plaintiffs' claims to individual arbitration.  *Id.*

The opt-in period closed on May 7, 2024.  On June 21, 2024, this Court ordered that Apple could take written discovery from 5% of the collective (224 opt-in plaintiffs). Dkt. 278 at 3.  Apple served its written discovery on plaintiffs on July 22, 2024.  Approximately 20% of the plaintiffs served with written discovery did not respond, and on September 17, 2024, Apple served written discovery on 148 more opt-in plaintiffs pursuant to the parties' agreement.[3]

---

[3] Apple intends to move for the dismissal of opt-in plaintiffs who fail to respond to discovery. *See* Dkt. 278 at 3 ("if someone wants to participate in this case [the Court is] likely at some point to require them to provide the requested discovery absent good cause").

As of the date of this motion, 8,165 plaintiffs have opted in and not withdrawn. Of those, 3,683 have signed binding and enforceable arbitration agreements and did not opt out of arbitration. Robles Decl. ¶ 8.[4]

### III.    LEGAL STANDARD

The FLSA provides that a party may bring a collective action on behalf of other "similarly situated" employees. 29 U.S.C. § 216(b). The Ninth Circuit applies a two-step approach for determining whether an FLSA collective action is appropriate. *See, e.g.*, *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018). At the first step, plaintiffs move for conditional certification, the sole consequence of which is the issuance of court-approved written notice to individuals within the collective definition. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013); *Campbell*, 903 F.3d at 1101. Preliminary certification is conditioned on plaintiffs showing that they are "similarly situated" to potential collective members under a "lenient" standard that is "loosely akin to a plausibility standard." *Campbell*, 903 F.3d at 1109 (quotation marks omitted). At the second step, however, plaintiffs bear "a heavier burden" to show "substantial evidence" that they are "similarly situated" and collective treatment is appropriate. *Id.* at 1117–19. The standard for a "post-discovery decertification motion is effectively the summary judgment standard," with the burden remaining on the plaintiff "on the question of entitlement to the collective action mechanism." *Id.* at 1118–19.

Employees are "similarly situated" for FLSA purposes "to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Campbell*, 903 F.3d at 1117. "[W]hat matters is not just *any* similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1115.

---

[4] Apple has at all times maintained that opt-in plaintiffs subject to arbitration are not proper plaintiffs in this action. It has produced only arbitration agreements and no other discovery for these opt-in plaintiffs and has repeatedly requested that they withdraw their consent forms. Should the Court deny this motion as to those individuals, Apple intends to move to compel them to arbitration. *See* Dkt. 323 (Transcript of September 3, 2024 Proceedings) at 5:1–5 (expressing intent to compel arbitration as to opt-in plaintiffs if necessary); Dkt. 297 (Joint Case Management Statement) at 6 (same).

Decertification of a collective action may be permitted even of "otherwise similarly situated plaintiffs" where procedural considerations make the collective mechanism "truly infeasible." *Campbell,* 903 F.3d at 1116. "The two-step process, culminating in a decertification motion on or after the close of relevant discovery, has the advantage of ensuring early notice of plausible collective actions, then eliminating those whose promise is not borne out by the record." *Id.* at 1110.

## IV.    ARGUMENT

Plaintiffs cannot meet their burden to show that they are similarly situated. *First*, the record illustrates that Plaintiffs' theory as to why RSUs were *wrongfully* excluded from the regular rate of pay, by their own characterization, rests primarily on evidence regarding employees' individualized understanding of their RSU awards—based largely on individual conversations with their managers. *Second*, the conditionally certified collective includes nearly 100 individual employees that are likely properly classified as exempt and who cannot be considered similarly situated. *Third*, almost half of the conditionally certified collective is comprised of individuals who agreed to arbitrate their claims. Not only does the Court lack jurisdiction over their claims, but they are not similarly situated to plaintiffs who can pursue their claims in this action.

### A.    Plaintiffs Are Not Similarly Situated Because the Resolution of Their Claims Turns on Individualized Issues

Plaintiffs' basis for conditional certification was premised entirely on Apple's "policy and practice of not including the vested RSU compensation in their overtime rate of pay." Dkt. 78 at 1. But in order to succeed on their theory of liability, Plaintiffs must show a common policy that actually *violates the FLSA*. In other words, Plaintiffs must prove that Apple's exclusion of the value of vested RSUs from the regular rate of pay improperly omits a form of alleged compensation that should be included. The merits of Plaintiffs' claims will turn on whether RSUs fall within any of the exclusions from the regular rate of pay enumerated in the FLSA. Two of the relevant exclusions are for sums paid as gifts, "the amounts of which are not measured by or dependent on hours worked, production, or efficiency," 29 U.S.C. § 207(e)(1), and payments "which are not made as compensation for . . . hours of employment," *id.* § 207(e)(2). But when asked in deposition, the only evidence that Plaintiffs

adduced in support of the merits of their claim was based on individualized inquiries—their individual conversations with their managers, which differed even between the three named Plaintiffs—rather than any similarities among the collective. Plaintiffs cannot show "substantial evidence" that they are similarly situated with respect to the material question in this case—whether RSUs were properly excluded from their regular rate of pay.

The evidence in this case illustrates that Apple's RSU awards are *not* compensation, but rather are discretionary payments, properly excludable from the regular rate of pay. Whether to make an RSU award to an employee and the size of the grant is a discretionary decision made by Apple. McTernan Decl., Ex. 4 (Jenkinson 30(b)(6) Dep. Tr.) at 50:20–51:7. The Apple Employee Stock Plan specifically provides that RSU awards are "not intended to be compensation of a continuing or recurring nature, or part of a Participant's normal or expected compensation, and in no way represent[] any portion of a Participant's salary, compensation, or other remuneration." *Id.*, Ex. 2 (2022 Employee Stock Plan) at APLCOSTA00000078. Instead, any RSU award "is an exceptional, discretionary, one-time grant, is voluntary, and occasional and does not create any contractual or other right to receive future awards of RSUs, or benefits in lieu of RSUs, even if RSUs have been awarded in the past," and "all decisions with respect to future awards, if any, will be at the sole discretion of the Company." *Id.*, Ex. 8 (2022 Employee Stock Plan Global Restricted Stock Unit Award Agreement) at APLCOSTA00001625. Moreover, RSU awards are not based on work performed, hours worked, or productivity. *Id.*, Ex. 4 (Jenkinson 30(b)(6) Dep.) at 52:16–24; 138:1–8. And, unlike hourly and overtime wages, RSU awards can be declined; when employees decline, it has absolutely no impact on their pay because it is not part of any compensation for their work. *Id.* at 52:16–24; 80:13–22; McTernan Decl., Ex. 1 (RSU Grant Email) at APLCOSTA00442368. Employees who accept their RSU awards can later choose to sell their vested Apple shares for any purpose, and many employees treat these shares as a gift to fund special purchases, including putting a down payment on a house or funding their child's education. *See, e.g.*, McTernan Decl., Ex. 9 (McIlravy-Ackert Dep. Tr.) at 92:25–93:9 (proceeds used for down payment); *id.*, Ex. 10 (Hernandez Dep. Tr.) at 46:3–11 (proceeds used for down payment and condo remodeling); *id.*, Ex. 11 (Waldman Dep. Tr.) at 56:8–19 (proceeds used to fund son's education).

1    The only evidence Plaintiffs can muster to support their argument that the RSU awards do not

2    actually fall within one of the exclusions from the regular rate of pay enumerated in the FLSA is

3    deposition testimony regarding how individual employees understood their RSU awards, including

4    based on communications from managers that led them to believe that RSU awards were a form of

5    compensation. For example, opt-in plaintiff Lily Free specifically explained that her belief that RSUs

6    are "a form of compensation" comes from "[t]he fact that any discussions of RSU grants have been

7    included in discussions about [her] compensation and the fact that it is contingent on [her]

8    employment." McTernan Decl., Ex. 15 (Free Dep. Tr.) at 48:16–21. Similarly, opt-in plaintiff Christie

9    Butron stated that she "knew" RSUs were being awarded as "part of [her] salary" "because there was

10   conversations around it from the managers who gave [her] review." *Id.*, Ex. 21 (Butron Dep. Tr.) at

11   41:13–16. While managers do not administer the Apple Employee Stock Plan and the terms and

12   conditions of RSU awards are established by the relevant Apple Employee Stock Plan and RSU Award

13   Agreements, the testimony from the named Plaintiffs and opt-in plaintiffs shows that they believe these

14   individualized conversations are relevant, requiring separate inquiries into each plaintiff's unique

15   communications and understanding of their RSU award. As a result, Plaintiffs cannot show a legal or

16   factual similarity material to their claims. *Campbell*, 903 F.3d at 1115; *cf. Culley v. Lincare Inc.*, 2017

17   WL 3284800, at *5–6 (E.D. Cal. Aug. 2, 2017) (decertifying class on overtime bonus claim because

18   individual issues of how plaintiffs viewed bonus would predominate over common issues).

19       The individualized nature of these conversations and of employees' understanding of their RSU

20   awards is apparent from the named Plaintiff and opt-in plaintiff depositions and the declarations

21   submitted by Apple managers. For example, all three named Plaintiffs testified that they believed their

22   managers conveyed the impression that RSUs were a part of their compensation, but the conversations

23   described varied widely in whether RSU awards were classified as a bonus, a merit increase, or part of

24   Apple's benefits, discounts, or other discretionary programs. Named Plaintiff Hoffman testified that

25   she recalled her "supervisor specifically telling" her that "RSUs are part of [her] annual bonus" and

26   "part of [her] pay [given] here at Apple." McTernan Decl., Ex. 18 (Hoffman Dep. Tr.) at 38:23–39:8.

27   Named Plaintiff Costa testified that his managers told him that "as part of [his] merit increase, [he was]

28

14

1   receiving RSU grants." *Id.*, Ex. 19 (Costa Dep. Tr.) at 90:6–9.  Named Plaintiff McIlravy-Ackert,

2   meanwhile, testified that in performance reviews with her supervisors, they would "highlight all the

3   different benefits that the company offers, the health insurance and that kind of stuff, and then go[]

4   over your compensation which they would always say included the stock grant for the RSUs" and

5   described these items as "perks." *Id.*, Ex. 9 (McIlravy-Ackert Dep. Tr.) at 49:24–50:19, 54:25–55:5.

6        In contrast, some opt-in plaintiffs and Apple managers described that when RSUs were

7   discussed during performance reviews it was as a separate category entirely, although these

8   conversations also varied.  Safiya Sears testified that in annual meetings with her manager, RSUs were

9   discussed separately from raises, and "the conversation would basically be like this is what [your raise]

10  is, this is your RSUs, and to compensate for whatever else, . . . these are the other benefits you're also

11  receiving." McTernan Decl., Ex. 12 (Sears Dep. Tr.) at 20:15–24.  Rachel Case also testified that RSU

12  awards were in a separate category from annual raises, stating that her managers typically told her:

13  "Here's the percentage of your raise.  Here is your new dollar amount.  Here is the RSU grant," and

14  told her that her RSU award "was a gift." *Id.*, Ex. 17 (Case Dep. Tr.) at 35:14–15, 43:21–23.  In his

15  discussions regarding RSU awards with hourly employees he supervised, Erik Schaeffer "separately

16  discuss[ed] Restricted Stock Units, with other programs offered by Apple such as benefits like health

17  insurance and 401(k)." Schaeffer Decl. ¶ 7.  And Erica Sheu would identify for hourly employees she

18  supervised "any Restricted Stock Unit ('RSU') grant Apple may have recommended for them that year,

19  in addition to the bonus they may have earned and any changes to their rate of pay." Sheu Decl. ¶ 5.

20       Other opt-in plaintiffs described general conversations about RSUs, not necessarily tied to

21  performance reviews or compensation discussions.  James Doyle testified that RSUs were discussed in

22  store-wide meetings when "new employees were being given information about their benefits."

23  McTernan Decl., Ex. 14 (Doyle Dep. Tr.) at 32:11–23.  Eric Roch testified that "the conversations

24  around RSUs tended to be pretty generic and vague" and could happen "day-to-day." *Id.*, Ex. 16 (Roch

25  Dep. Tr.) at 34:14–35:2.

26       Still other opt-in plaintiffs testified that they did not recall their managers ever discussing RSU

27  awards as part of their compensation.  *See* McTernan Decl., Ex. 20 (Nisenboym Dep. Tr.) at 33:7–14

28

15

(testifying that he could not recall any conversations where his manager discussed RSUs, but viewed RSUs as "another benefit that employees at Apple got"); *id.*, Ex. 13 (Shahinyan Dep. Tr.) at 62:21–63:6 (no recollection of discussing RSUs with manager). And some Apple managers, like Babak Shafiei, did not communicate with the hourly employees they supervised concerning their discretionary awards of RSUs "unless it was in the context of a promotion." Shafiei Decl. ¶ 10.

Where Plaintiffs' theory of liability depends on individualized inquiries, decertification of the collective is warranted. In *Phillips v. County of Riverside*, 2022 WL 2162822 (C.D. Cal. Apr. 7, 2022), for example, the court granted conditional certification where plaintiffs alleged that the defendant "engaged in a systemic practice . . . to deny them overtime for administrative tasks." *Id.* at *4. But at the second stage of the certification process, the court found that the evidence did "not support a finding of a systemic policy that prevents the reporting of earned overtime" because the overtime denials were based on a "supervisor and situation-dependent [practice] rather than a department-wide practice of denying or prohibiting overtime for administrative tasks." *Id.* at *5. As determination of the merits of plaintiffs' claims "necessarily require[d] individualized review," the court held that the plaintiffs were not similarly situated and the FLSA collective was decertified. *Id.*

The same result is warranted here. While Plaintiffs contend that Apple has a "common policy" applicable to the entire collective, they are not able to meet their substantial evidentiary burden of showing a "similarity material to the resolution of the party plaintiffs' claims," *Campbell*, 903 F.3d at 1115, because their own characterization of the merits of their claims rely on "individualized review" of a "supervisor and situation-dependent" practice of contextualizing RSU awards as compensation, *Phillips*, 2022 WL 2162822, at *5. Where, as here, the individualized differences between plaintiffs "go to the heart of the merits issue to be decided," the collective must be decertified. *Guanzon v. Vixxo Corp.*, 2019 WL 1586873, at *7 (D. Ariz. Apr. 12, 2019).

## B.    Exempt Plaintiffs Cannot Be Similarly Situated as to Any Material Issue

Plaintiffs cannot show that they are similarly situated for an independent reason—the collective includes members who are not eligible for overtime pay at all, and thus have no valid FLSA claim. The collective definition includes "[a]ll current and former employees of Apple Inc. classified as non-

16

exempt/overtime eligible." Dkt. 112 at 4. The mere fact that Apple has classified certain employees "as non-exempt and paid them as though they were non-exempt does not mean that they were in fact non-exempt." *Perez v. Wells Fargo & Co.*, 2015 WL 10558841, at *2 (N.D. Cal. Nov. 24, 2015). To the contrary, "[w]hether the employees are actually exempt or not requires an inquiry into their job duties." *Id.* Plaintiffs that are properly classified as exempt are not subject to overtime requirements under the FLSA and have no standing to challenge whether RSUs are "compensation" that must be included in the regular rate of pay calculation. The opt-in plaintiffs are thus not similarly situated with respect to a threshold issue material to the resolution of their claims—whether they are eligible for overtime in the first place.

Courts in the Ninth Circuit have decertified FLSA collectives where individualized assessments of exemption defenses made it inappropriate to proceed on a collective basis. In *Salazar v. Driver Provider Phoenix LLC*, 2023 WL 5608388 (D. Ariz. Aug. 30, 2023), for example, the court conditionally certified a collective of drivers who provided chauffeur services for the defendants, based on the plaintiffs' claim that the drivers had "the same job duties," were "subject to the same policies and procedures," and were "subject to the same compensation structure." *Id.* at *2 (quotation marks omitted). The defendants moved to decertify the collective, arguing that the plaintiffs "had different job duties and were paid differently" based on multiple factors, which would require the court to "individually analyze whether [the plaintiffs] are exempt" from overtime requirements. *Id.* The court agreed and granted the motion to decertify, finding that determining whether the plaintiffs were exempt would necessitate "conducting approximately 80 mini-trials for each individual [plaintiff's] compensation." *Id.* at *5. In *Guanzon,* plaintiffs who held the role "Team Lead" alleged that they had been misclassified as exempt, and the court granted conditional certification. 2019 WL 1586873, at *1. Upon the defendant's motion to decertify, the court found that the opt-in plaintiffs were not "'similarly situated' with respect to the amount of discretion and independent decision-making authority they possessed," *id.* at *6, which the court found was the primary "issue that is material to the resolution of the party plaintiffs' claims" regarding whether they fell within the administrative exemption, *id.* at 5 (quotation marks omitted). The court therefore granted the motion to decertify

1    "even though plaintiffs sought to challenge [the] employer's uniform application of an exemption to

2    an entire class of employees, because the opt-in plaintiffs' testimony varies significantly with respect

3    to factors relevant to the FLSA exemptions." *Id.* at *7 (quotation marks omitted).

4          In this case, there are at least 89 opt-in plaintiffs who may be exempt under the FLSA's overtime

5    provisions for whom individualized assessments will be required.  Thomas Decl. ¶ 5.  Opt-in plaintiffs

6    who are "[c]omputer systems analysts, computer programmers, software engineers or other similarly

7    skilled workers in the computer field" may be subject to the computer exemption to FLSA's overtime

8    requirement.  29 C.F.R. § 541.400.  This exemption applies to employees who are primarily responsible

9    for designing, developing, testing, and modifying computer systems and computer programs.  *Id.*  Many

10   of Apple's employees in software engineering roles performed these tasks, and Apple has identified at

11   least 14 positions held by opt-in plaintiffs that, while formally classified as non-exempt, may in fact be

12   exempt positions depending on how the roles were performed.  *See* Thomas Decl. ¶ 5; *see also*

13   McTernan Decl., Ex. 7 (Thomas 30(b)(6) Dep. Tr.) at 57:13–65:15 (describing hourly positions

14   possibly exempt from overtime laws); *id.*, Ex. 22 (Apple's Fifth Suppl. Resp. and Obj. to Pls.' First Set

15   of Interrog.) at 74:11–75:4.

16         The job titles that Apple has identified to date each involve the technical, self-driven, and

17   computer-based work that the computer professional exemption was designed to cover.  For example,

18   Eric Roch worked as a Design Verification Engineer.  *See* McTernan Decl. Ex. 16 (Roch Dep. Tr.) at

19   10:1–4.  In that position, he analyzed errors in code, discussed those errors and potential solutions with

20   colleagues, and wrote code to correct technical issues.  *Id.* at 41:25–48:18.  Roch described his work

21   in this position as "inherently creative," and explained that in his role, he used discretion and creativity

22   to resolve problems with broken code.  *Id.* at 18:2–19:6, 46:4–16.  Lily Free, who worked as a Software

23   Integrity Engineer 2, testified that she tested Apple devices based on design specifications and has

24   written various tests to determine whether Apple devices were functioning as designed.  *See* McTernan

25   Decl., Ex. 15 (Free Dep. Tr.) at 14:16–15:4, 33:8–18, 36:4–37:3; *see also* 29 C.F.R. § 541.400

26   (computer professions exemption applies to employees whose "primary duty consists of: . . . *testing* or

27   modification of computer systems or programs, including prototypes, based on and related to user or

28

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

system design specifications" (emphasis added)).  While Free claimed that her job was not technical or complicated, she admitted that she was responsible for coming up for testing strategies without direction "multiple times a week," she wrote approximately 100 test protocols that are "routinely" run by other Software Integrity Engineers, and that having more than basic familiarity with coding language would help her do her job more effectively.  McTernan Decl., Ex. 15 (Free Dep. Tr.) 34:18–35:15, 37:4–13, 38:22–24.  Apple's corporate designee described still more roles that require work in "very complex" subsections of software engineering and "rigorous" testing on engineered chips.  McTernan Decl., Ex. 7 (Thomas 30(b)(6) Dep. Tr.) at 61:17–23, 62:9–13.

Managers of employees in these roles confirm that these employees are engaged in highly technical work, such as software engineering, computer programming, or computer systems analysis, and must use their discretion and creativity to perform their duties.  For example, employees in the Tools & Automation Engineer 2 role conduct "quality control testing for a variety of new Apple technologies and products," and are required to have "a high level of technical understanding" to fulfill their job duties of "writing test plans based on the specifications of the technology and executing the test plans [to] assess[] any issues for escalation."  Declaration of Divya Poulose (Poulose Decl.) ¶¶ 2–3.  Employees in the Data Scientist 2 role "develop software to automate systems for data analysis and processing" and have autonomy in "how to develop their software" as well as "writing the code necessary to create the test frameworks they have designed."  Schaeffer Decl. ¶¶ 4–5.  The Machine Learning Engineer 2 role is "highly intellectual" because employees in this role are "evaluating machine learning models, which are a form of artificial intelligence" and developing metrics to measure how these models are performing, running analytics to test them, and developing ways to optimize the models' performance.  Declaration of Brett Keating (Keating Decl.) ¶ 4.  Employees in the Hardware Associate Engineer 2 role "use specialized tools and techniques to test, research and help build cutting-edge hardware that Apple will ultimately sell to its consumers as part of computer systems."  Sheu Decl. ¶ 3.  This role requires judgment and discretion to "identify[] issues with the data they are analyzing" and "obtain[] new data to confirm their findings."  *Id.* ¶ 4.  Employees in these roles are typically required to hold a bachelor's degree or master's degree in computer science, software

1   engineering, or a related field, and often also need proficient programming knowledge and experience

2   in computer science.  *See, e.g.*, Declaration of Vinodh Cuppu (Cuppu Decl.) ¶ 3; Keating Decl. ¶ 4;

3   Schaeffer Decl. ¶ 4; *see also* Gattam Pandurangan Decl., Ex. A (Software Engineering Applications 2

4   Job Description).

5           The only way to determine whether opt-in plaintiffs holding these 14 roles are, in fact, eligible

6   to seek damages for FLSA overtime violations is to individually analyze the actual responsibilities of

7   each opt-in plaintiff who performed one of these jobs during the collective period.  *See Perez*, 2015

8   WL 10558841, at *2; *cf. In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th

9   Cir. 2009) (a "blanket exemption policy does nothing to facilitate common proof on the otherwise

10  individualized issues" regarding exemptions); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935,

11  944–48 (9th Cir. 2009) (affirming denial of class certification where exemption analysis "would require

12  an individualized inquiry into the manner in which each [employee] actually carried out his or her

13  work").  "Job title alone is insufficient to establish the exempt status of an employee," 29 C.F.R.

14  § 541.2, and even individuals who hold the same role may have different job duties.  For example,

15  employees who hold the Software Integrity Engineer 2 role may have one of two completely different

16  responsibilities: either screening, assessing, and resolving bug reports on the one hand, or performing

17  manual test cases on developing software on the other.  Shafiei Decl. ¶¶ 7–8.

18          This exemption status inquiry would require close to 100 "mini-trials" to be conducted, and

19  Plaintiffs' discovery requests underscore that they intend to litigate this issue on an individualized

20  basis.  They have requested individualized discovery from Apple for every opt-in plaintiff subject to

21  an exemption defense, including performance reviews, individual training materials, and other

22  documents reflecting their job duties.  McTernan Decl., Ex. 23 (Pls.' July 3, 2024 Requests for

23  Production) at 2.  And even one trial on this issue can take multiple days.  For example, a court in this

24  district recently conducted a four-day bench trial on the sole question of whether a single plaintiff

25  seeking overtime pay under California law was subject to the executive exemption to overtime law in

26  California.  *See Ortiz v. Amazon.com LLC*, 2022 WL 1598968, at *1 (N. D. Cal. May 20, 2022).

27  Conducting nearly 100 such trials would make proceeding on a collective basis "truly infeasible."

28

*Salazar*, 2023 WL 5608388, at *2–5 (finding that necessity of individual assessments of "job duties, expectations, and responsibilities" made proceeding as a collective "infeasible").

### C.      Plaintiffs Are Not Similarly Situated Because Nearly Half the Opt-In Plaintiffs Must Arbitrate Their Claims

Finally, Plaintiffs cannot carry their burden to show that they are similarly situated because 3,683 opt-in plaintiffs are bound to individually arbitrate their claims.  Robles Decl. ¶ 8.  At the conditional certification stage, this Court declined to exclude from the collective definition "employees who may be subject to valid arbitration agreements" because there had not yet been a ruling "on whether Apple's arbitration agreement is enforceable."  Dkt. 98 at 9–10.  Since that time, the Court has determined that two versions of Apple's arbitration agreement, the May 2016 Agreement and the January 2019 Agreement, are valid and enforceable, and granted Apple's motion to compel individual arbitration.  Dkt. 130.  Apple has since produced signed arbitration agreements for 3,672 of the 3,683 opt-in plaintiffs bound by such agreements.  McTernan Decl. ¶ 2.

Plaintiffs have not raised any claim that these agreements are not valid and enforceable.  Nor could they.  Each of these agreements is materially identical to the agreements that this Court already enforced and identical as to the provisions that bear on whether any opt-in plaintiffs can participate in this litigation.  *See supra* 8–9.  The agreements cover "all disputes arising out of or related to [an employee's] employment with Apple Inc.," including "disputes related to . . . wages [and] overtime," as well as "claims arising under the . . . Fair Labor Standards Act."  *E.g.*, Robles Decl., Ex. C (July 2017 Arbitration Agreement) ¶¶ 1, 2; *id.*, Ex. F (November 2018 Arbitration Agreement) ¶¶ 1, 2.  All of the arbitration agreements "include a class action waiver, a delegation clause, and a severability provision."  Dkt. 130 at 2; *see also, e.g.*, Robles Decl., Ex. D (August 2017 Arbitration Agreement) ¶¶ 4, 7, 8.  The delegation clause provides that "any legal dispute or controversy covered by th[e] Agreement, or arising out of, relating to, or concerning the scope, validity, enforceability, or breach of th[e] Agreement . . . shall be resolved by final and binding arbitration in accordance with the JAMS Rules then in effect, and not by a court or jury trial."  *E.g.*, Robles Decl., Ex. H (February 2022 Arbitration Agreement) ¶ 7.  Since May 2018, the agreement also provided applicants an explicit right

21

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

1  to opt out. Robles Decl. ¶ 6. This Court has enforced versions both with and without the opt-out

2  provision. Dkt. 130 at 7–8.

3       Any minor differences across these agreements have no bearing on their enforceability. For

4  instance, more recent versions exclude from arbitration claims of harassment—none of which are

5  implicated here. *See, e.g.*, Robles Decl., Ex. F (November 2018 Arbitration Agreement). Other

6  versions make minor changes, such as clarifying the effect of an electronic signature or reframing the

7  class action waiver based on changes to the law. Robles Decl., Ex. C (July 2017 Arbitration

8  Agreement); *id.*, Ex. I (October 2022 Arbitration Agreement). None of these issues impact the

9  enforceability of the agreements. And, as this Court found, any issues regarding the enforceability of

10  the agreement have been validly delegated to the arbitrator. Dkt. 130 at 5–8; *see also Bitstamp Ltd. v.*

11  *Ripple Labs Inc.*, 2015 WL 4692418, at *5 (N.D. Cal. Aug. 6, 2015) (Orrick, J.) (incorporation of

12  JAMS rules "clearly and unmistakably . . . assigned the arbitrability question to the arbitrator").

13  Accordingly, there is no dispute that the opt-ins who signed arbitration agreements are bound to

14  individually arbitrate their claims. Because thousands of plaintiffs are not "alike in ways that matter

15  to the disposition of their FLSA claims"—namely, whether those claims can be brought before the

16  Court—the plaintiffs have not shown that they are similarly situated. *Campbell*, 903 F.3d at 1114.

17       Alternatively, even if the FLSA collective is not decertified, the Court should modify the

18  definition of the collective to exclude and dismiss the thousands of opt-in plaintiffs who signed

19  arbitration agreements covering the claims at issue here. The Court has "discretion to modify the

20  definition of the conditionally certified FLSA collective" in order to exclude these opt-in plaintiffs.

21  *Carlino v. CHS Med. Staffing, Inc.*, 634 F. Supp. 3d 895, 901 (E.D. Cal. 2022); *see also Geiger v.*

22  *Charter Commcn's, Inc.*, 2019 WL 8105374, at *4 (C.D. Cal. Sept. 9, 2019) (redefining the FLSA

23

24

25

26

27

28

DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION
FOR DECERTIFICATION OF THE FLSA COLLECTIVE
CASE NO. 3:23-CV-01353-WHO

1  collective to exclude plaintiffs who agreed to arbitration provisions); *Gonzales v. Charter Commc'ns,*

2  *LLC*, 2020 WL 8028108, at *5 (C.D. Cal. Dec. 4, 2020) (same).[5]

3        Because opt-in plaintiffs subject to binding arbitration agreements are not similarly situated

4  under the FLSA, courts in this Circuit have modified collective definitions to exclude them.  In *Geiger*,

5  for example, the court reconsidered its prior conditional certification decision that had not excluded

6  dispatchers who signed arbitration agreements from the collective definition.  2019 WL 8105374, at

7  *2–3.  The court first found that the arbitration agreements were "more likely than not enforceable"

8  based on the defendants' evidence regarding the terms of the agreements, the process by which

9  dispatchers would have agreed to them, and the plaintiffs' failure to challenge the enforceability.  *Id.*

10  at *4.  Because the "collective action [was] likely . . . implausible with respect to any arbitration-

11  bound plaintiffs," the court determined that redefining the collective was appropriate.  *Id.* at *6.  And

12  in *Gonzales*, after the court granted the defendant's motion to compel arbitration as to certain named

13  plaintiffs, all parties and the court agreed that the "plaintiffs [were] not similarly situated to arbitration-

14  bound" employees.  2020 WL 8028108, at *5 (capitalization omitted).  As a result, the court revised

15  the collective definition to "appropriately exclude [] employees subject to arbitration."  *Id.*

16        The same is true here.  After this Court granted conditional certification, the Court found

17  Apple's arbitration agreements enforceable.  Plaintiffs, too, conceded that arbitration-bound employees

18  are not proper plaintiffs when they excluded them from their proposed class definitions.  Dkt. 299 at 2

19  (proposing classes defined to "exclud[e] those who signed an arbitration agreement").  Accordingly,

20  the Court should—at the very least—revise the collective definition to exclude current and former

21  employees subject to arbitration.

---

[5] On Plaintiffs' motion, the Court stayed the claims of the four opt-ins compelled to arbitration.  Dkt. 170.  While this is the proper course "[w]hen a district court finds that a lawsuit involves an arbitrable dispute," *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024), this is not applicable here, where Apple seeks to exclude plaintiffs who are not similarly situated.  *See, e.g.*, *Errickson v. Paychex, Inc.*, 447 F. Supp. 3d 14, 27 (W.D.N.Y. 2020) (finding that putative opt-in plaintiffs who signed arbitration agreements "are not similarly situated" because of the "procedural and legal issues unique" to them, and denying the plaintiffs' argument that they should be included in the collective and then their claims stayed).

1

**V.    CONCLUSION**

2        Apple respectfully requests that the Court decertify the FLSA collective, or, in the alternative,

3  modify the FLSA collective definition.  Apple respectfully requests oral argument on this motion in

4  person, if possible.

5

6

7  DATED: October 14, 2024                     GIBSON, DUNN & CRUTCHER LLP
                                        THEODORE J. BOUTROUS JR.

8                                          THEANE EVANGELIS
                                        MEGAN COONEY

9                                          CYNTHIA CHEN MCTERNAN

10                                By:  */s/ Theane Evangelis*

11                                         Theane Evangelis

12                                *Attorneys for Defendant Apple Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28